UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| CR ASSOCIATES L.P., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 17-10551-LTS |
| SPAREFOOT, INC. | ) ) ) | |
| Defendant. | ) ) | |

ORDER ON MOTION TO DISMISS AND MOTION TO TRANSFER

February 20, 2018

SOROKIN, J.

On March 31, 2017, CR Associates L.P. ("CR") sued defendants Selfstorage.com, LLC, ("Selfstorage"); Argus Self Storage Sales Network, Inc., ("Argus");[1] and Sparefoot, Inc ("Sparefoot"), claiming that these entities violated federal and Massachusetts trademark and unfair competition laws by the improper use of CR's trademark name on defendants' websites. Doc. No. 1. Specifically, CR alleges the defendant websites have used CR's mark "Cross Road Storage" (a) to boost defendants' Google search results and (b) on defendants' own websites, to say CR's self-storage facility is "unavailable" while directing viewers to other self-storage facilities under contract with defendants. Id. at ¶¶ 12-23. At issue in the complaint are two websites, Selfstorage.com and Sparefoot.com, both of which are operated by Sparefoot, see id.; Doc. No. 31 at 2; Selfstorage owns the domain name Selfstorage.com, the use of which it licensed to Sparefoot. Doc. No. 31 at 1. Defendant Selfstorage moves to dismiss for lack of personal jurisdiction. Doc. No. 29. Defendant Sparefoot moves to transfer pursuant to a forum

---

[1] On May 24, 2017, CR voluntarily dismissed all claims asserted against Argus. Doc. No. 39.

selection clause in a contract allegedly executed on February 2, 2017. Doc. No. 32. CR opposes both motions, Doc. Nos. 29, 32, and has filed an emergency motion to amend its complaint, Doc. No. 70.

I.      EMERGENCY MOTION TO AMEND

The Emergency Motion to Amend (Doc. No. 70) is DENIED for several reasons. First, as to Selfstorage it is futile, the Court lacks personal jurisdiction over Selfstorage, infra at 3-5, and nothing in the proposed Amended Complaint changes the jurisdictional analysis. Second, purportedly, the motion to amend eliminates claims arising from conduct after the execution of the February 2, 2017 contract and thus avoids, according to CR, the forum selection clause. Doc. No. 70 at 4-5. Whatever the merits of such a position, neither the language of the proposed Amended Complaint nor CR's conduct support the conclusion that CR disavows its claims arising from conduct that transpired after February 2, 2017. See Doc. No. 70-3. The Proposed Amended Complaint contains no such disclaimer and does contain general language suggesting the claims *are* based upon post February 2, 2017 conduct. E.g. id. at ¶¶ 27, 32, 37, 42, 48 ("Defendants' actions have damaged *and continue* to damage Plaintiff's rights, reputation, and good will.") (emphasis added); id. at 15 (requesting "appropriate preliminary and permanent injunctive relief."). Furthermore, CR moved for partial summary judgment on liability from its Mass. Gen. Laws. Chapter 93A claim based upon events between December 25, 2016 and March 25, 2017. Doc. No. 81 at page 5; see also Doc. No. 82 at 4. In CR's statement of facts, Doc. No 82, it stated that its expert "calculations are based on analysis of a three-month period in which it is undisputed that Sparefoot was using the CrossRoad Storage name without authorization on its websites." Id. at 4 n.1. This period includes dates after the February 2, 2017 contract. Thus, CR,

continues to rely on post February 2, 2017 events as the basis for its claims. Accordingly, its Motion to Amend (Doc. No. 70) is DENIED.

II.     SELFSTORAGE'S MOTION TO DISMISS

The Court applies the prima facie standard for determining personal jurisdiction in this case. Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 143 (1st Cir. 1995). "To make a prima facie showing . . . the plaintiff ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts. . . [T]he court [then] . . . must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." Id. at 145. The facts here are undisputed. Defendant Selfstorage has no activities, operations or customers in Massachusetts. It is organized and based outside of Massachusetts. Doc. No. at ¶¶ 5, 7. There is no general jurisdiction over Selfstorage, and CR does not contend otherwise. See Doc. No 46. CR asserts only specific jurisdiction. See id. Selfstorage's connection to this case is narrow: it owns the domain name "selfstorage.com" and it has entered into an exclusive license arrangement with defendant Sparefoot permitting Sparefoot to operate a site using the domain name. Doc. No. 1 at ¶ 8. A copy of the agreement is before the Court. Doc. No. 46-2. Under that agreement, Sparefoot, Inc, not Selfstorage, "shall . . . design, develop, operate, and manage" the selfstorage.com website. Id. at 5. Sparefoot, not Selfstorage, bears responsibility for server hosting, website development and maintenance, customer service and support, and marketing and promotion. Id. at 5-6. In other words, the content, operation and management of the website belongs entirely to Sparefoot.

The foregoing facts would ordinarily end the jurisdictional inquiry because they establish both that (1) CR's claims arise out of conduct that is not Selfstorage's and (2) the conduct to which CR points to as purposeful availment by Selfstorage—the content or operation of the

3

website—is not Selfstorage's conduct. See Doc. No. 46 at 6-7. But CR points to several more facts to support the assertion of the jurisdiction. First, CR asserts that Selfstorage, under the agreement, "actively participates in the maintenance and upkeep of the site." Id. at 3. The agreement says otherwise. Doc. No. 46-2 at 5-6. Selfstorage's only responsibility has to do with hosting the domain name, paying the registration fees for the name, and aiding in recovery if the name becomes unavailable. Id. at 6. All of this is unrelated to Massachusetts, CR's claims, or purposeful availment. See Hilsinger Co. v. FBW Investments, 109 F. Supp. 3d 409, 430 (D. Mass. 2015) (explaining that, as a general rule, personal jurisdiction "does not exist over a licensor by virtue of its status if it . . . has no dealings with the licensee beyond the receipt of royalty income") (quotations omitted). Selfstorage's limited responsibilities do not involve content control or use of the website Selfstorage.com. Second, Selfstorage may sell or assign its ownership interest in the domain name. Id. at 16. But, that right has no relationship to the instant claims or the forum Massachusetts. Finally, CR asserts Selfstorage "has the legal obligation to indemnify Sparefoot for any legal action taken cause [sic] by the use of www.selfstorage.com and [Selfstorage] has the right to control the defense or settle any claims." Doc. No. 46 at 9 (citing Doc. 46-2 at 11-12). By its terms, this provision only applies to events "arising prior to [January 1, 2015] the Effective Date [of the agreement]." Doc. No. 46-2 at 12. Even assuming this provision implies that Selfstorage controlled the content of Selfstorage.com prior to January 1, 2015, the provision is of no assistance to CR. The only specific factual allegations described in the complaint occurred in February 2017. Doc. No. 1-5. CR amplified these facts by asserting that it first become aware of the problems described in the Complaint in December, 2016. Doc. No. 47 at 2.

As Plaintiff concedes, "a license agreement that merely entitles the licensor to royalties without reserving a right to control the licensee's actions will not, by itself, be sufficient to support personal jurisdiction." Doc. No. 46 at 6-7 (quoting <u>Automated Facilities Mgmt. Corp. v. Smartware Grp., Inc.</u>, No. 12-CV-327-PB, 2013 WL 5723314, at *4 (D.N.H. Oct. 21, 2013)). Under these circumstances, CR has failed to meet its burden to establish that its claims against Selfstorage arise out of Massachusetts or that Selfstorage purposefully availed itself of the opportunity to do business here.

For the foregoing reasons, the Motion to Dismiss for Lack of Personal Jurisdiction (Doc. No. 20) is ALLOWED.

III. <u>SPAREFOOT'S MOTION TO TRANSFER VENUE</u>

Sparefoot moves to transfer this case to the United States District Court for the Western District of Texas, Austin Division, pursuant to 28 U.S.C. § 1404. Doc. No. 32. In support of its motion, Sparefoot cites a forum selection clause in a contract agreement between Sparefoot and CR that CR allegedly executed on February 2, 2017. <u>Id.</u>

Becoming a client of Sparefoot involves four steps. Doc. Nos. 50-1 at 3; 56 at 2. First, a potential client requests a sign-up code by calling a phone number and entering, online, the code. Doc. No. 56 at 2. Though nothing specifically before the Court identifies when such a call was made on behalf of CR, it appears it was done as the process requires it. Second, the potential client creates an online account by completing certain company information as well as establishing both a username and email address for login and contact purposes. <u>Id.</u> at 2. Here, Kenneth Alves, Jr., did that on or about January 22, 2017 by creating an account in the name of Cross Road Self Storage using the following email address: westmainselfstorage@gmail.com. Doc. No. 34 a 3. Third, Sparefoot requires new clients to agree to Sparefoot's terms. Doc. No. 56

5

at 2. Specifically, Sparefoot requires each new client to agree to certain payment rules, audit rules and Sparefoot's "terms of use." Id. at 2-3. The "terms of use" phrase is a hyperlink that when clicked brings the user to a document entitled "terms of service." Id.[2] The user must click a box next to an "I agree" statement for each of these agreements. Id. at 3. The fourth step is submission of payment preferences and facility information. Id. at 3. Alves, Jr., completed the four steps, including agreeing to all contract terms on February 2, 2017. Id. at 4.

After a client completes the four steps of the sign-up process, a "walkthrough" between Sparefoot and the client is scheduled. Doc. No. 35 at 2. The purpose of the walkthrough is "to brief a new client regarding any actions that the client must take to complete the onboarding of its account with Sparefoot and to become an active Sparefoot client." Id. at 2. Despite a series of late January through late February 2017 phone calls between Alves, Jr., and a representative of Sparefoot, the walk through never occurred. Id. at 2. And thus, CR never became an active client of Sparefoot.

Two more facts bear mention. The specific "Facility Unavailable" messages CR cites in the Complaint, Doc. No. 1 at ¶ 19, according to the affidavits before the Court occurred after Alves, Jr., signed the terms of use on February 2, 2017. Doc. No. 34 at 3.[3] Sparefoot also alleges that the messages only arose because it was in the middle of transitioning CR from non-client to client status, see id., assertions CR disputes. Second, the combined ToU/ToS provides that "The federal and state courts of Travis County, Texas shall have exclusive jurisdiction and venue to adjudicate any dispute arising out of this Agreement." Doc. No. 50-1 at 34 ¶ 8.2.

---

[2] To avoid confusion, hereinafter, the Court refers to this document as the combined ToU/ToS.
[3] Supra at 2. Even with the proposed amended complaint, CR seeks relief arising out of post February 2, 2017 conduct.

First, CR asserts that the circumstances described above are insufficient to permit Sparefoot to enforce the forum selection clause against CR under the authority of Ajemian v. Yahoo! Inc. Doc. No. 93 at 2 (citing Ajemian v. Yahoo!, 83 Mass.App.Ct. 565 (2013), aff'd, 478 Mass. 169, 84 N.E.3d 766 (2017)). To be clear, Sparefoot seeks to enforce the combined ToS/ToU agreement containing the forum selection clause against CR. In Ajemian, the court considered whether a forum selection clause in an online ToS agreement was enforceable against defendants. Ajemian, 83 Mass.App.Ct. at 573. The court applied the traditional legal principles applicable when the enforceability of a forum selection clause is at issue in a case—that is, the provision must be "reasonably communicated and accepted." Id. The court identified two ways that online terms may be reasonably communicated: (1) clear notification to users of the availability of the terms of service by following a link; (2) display of the terms of the agreement "on the user's computer screen (in whole or in part)." Id. at 575. In either case, the consumer must plainly manifest his assent by, for instance, "clicking" 'I accept.'" Id. at 576. Here, the availability of the terms of services were communicated to Alves, Jr., by a blue hyperlink,[4] and Alves, Jr., manifested his assent to those terms by clicking "I agree." See Doc. 91-4 at 24. More was not required. See Cullinane v. Uber Techs., Inc., No. CV 14-14750-DPW, 2016 WL 3751652, at *6 (D. Mass. July 11, 2016) ("[A]n online contract in which website users are required to click on an 'I agree' box . . . permit courts to infer that the user was at least on

---

[4] Hyperlinks are commonly blue and underlined. See *Hyperlink*, TechTerms, https://techterms.com/definition/hyperlink (last visited February 13, 2018); see also *Hyperlink*, New World Encyclopedia (Jan. 23, 2018), http://www.newworldencyclopedia.org/entry/Hyperlink ("In most graphical web browsers, links are displayed in underlined blue text when not cached, but underlined purple text when cached."). Alves, Jr., was no stranger to internet userface. As a part of his job, he "worked to increase [a company's] visibility on the web." Doc. 91-4 at 15. A sophisticated business party who had done business on the internet, such as Alves, Jr., would understand that blue text, such as the text on Selfstorage.com, indicates the user should "click" to read.

inquiry notice of the terms of the agreement, and has outwardly manifested consent . . . [B]ecause the user has 'signed' the contract by clicking 'I agree,' every court to consider the issue has held [such] licenses enforceable.").[5]

CR next argues that it is not bound by the forum selection clause because Alves, Jr., a limited partner of CR, lacked authority to bind CR. Doc. No. 47 at 2, 2 n.1, 5. Contrary to CR's contention, Alves, Jr., had implied actual authority to bind CR. Actual authority is a product of "mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." CNE Direct, Inc. v. Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016). Implied actual authority arises when an agent has actual authority to accomplish a transaction; the agent then has "implied authority to do those acts that are reasonably necessary to accomplish the transaction for which the agent has actual authority." Lowell Hous. Auth. v. PSC Int'l, Inc., 692 F. Supp. 2d 180, 190 (D. Mass. 2010); see Transurface Carriers, Inc. v. Ford Motor Co., 738 F.2d 42, 45 (1st Cir. 1984) ("The law of principal and agent is clear that conferring authority to conduct a transaction gives authority to undertake acts incidental to the transaction.")."Implied authority may also arise from a principal's

---

[5] CR argues that the instant agreement is not enforceable because it is a "browsewrap" agreement. Doc. No. 93 at 2-3. The agreement at issue is not a traditional "browsewrap" agreement, which is an agreement whereby the customer "assents to the contract when the user visits the web site" whether the user knows it or not. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 429 (2d Cir. 2004). Here, the customer was required to manifest consent by clicking "I agree" before being given access to the next step in the sign-up process, making the agreement more akin to a traditional "clickwrap" agreement. Id. ("Under a clickwrap arrangement, potential licensees are presented with the proposed license terms and forced to expressly and unambiguously manifest either assent or rejection prior to being given access to the product."). Alves, Jr., was required to assent by clicking "I agree" before he could proceed with the sign-up process. Doc. No. 91-4 at 30.

course of conduct that demonstrates acquiescence in similar acts by the agent." Lowell Hous. Auth., 692 F. Supp. 2d at 190.

Alves, Jr., had implied actual authority to contract on behalf of CR pursuant to an investigation of CR, which he had actual authority to conduct. Kenneth Alves, Sr., the father of Alves, Jr., is the general partner of CR. Doc. No. 46-1 at 1. As general partner, Alves, Sr., may "delegate whatever tasks . . . to employees or limited partners or whoever [he] see[s] fit to carry out [those] tasks." Doc. No. 91-2 at 18. In December of 2016, CR, through Alves, Sr., discovered Sparefoot's alleged unlawful use of CR's protected mark "Cross Road Storage." Doc. No. 47-1. Alves, Sr., delegated the investigation of "the issues that [he] discovered with Sparefoot using [CR's] trademark" to his son Alves, Jr. Doc. No. 91-2 at 25; accord Doc. No. 91-4 at 14, 26; 91-2 at 25. Pursuant to this task, Alves, Jr., had authority to "investigate and report back." Doc. No. 91-2 at 27. "The details of [the investigation] [Alves, Sr.,] left up to [Alves, Jr.,]." Id. at 29. As part of the investigation, Alves, Jr. "went through the sign-up process with Sparefoot" Doc. No. 91-4 at 12. He testified that signing-up (including clicking "I agree to the Terms of Use") was "a reasonable part of [his] investigation" as "[i]t was necessary to obtain pricing" from Sparefoot. Id. at 30. Thus, Alves, Jr., was acting on CR's behalf, with authority to do so, when he investigated Sparefoot. Signing-up for Sparefoot, including agreeing to the terms of the combined ToS/ToU agreement, were incidental to the investigation; Alves, Jr., therefore had actual implied authority to bind CR with respect to the forum selection clause. Transurface Carriers, Inc., 738 F.2d at 45.[6]

---

[6] Alves, Jr., also had implied actual authority "aris[ing] from [Alves, Sr.,]'s course of conduct that demonstrate[d] acquiescence in similar acts by [Alves, Jr.,]." Lowell Hous. Auth., 692 F. Supp. 2d at 190. Over the course of its investigation of Sparefoot, CR employed a company named Double Helix to assist with investigation. Doc. No. 91-4 at 15. Alves, Jr., signed the

9

The subsequent conduct of Alves, Sr., is consistent with him having conferred authority on his son to contract with Sparefoot. After Alves, Jr., agreed to the combined ToU/ToS containing the forum selection clause, Sparefoot sent several emails to westmailselfstorage@gmail.com, the email address provided by Alves, Jr., when he signed up with CR, requesting that the email recipient schedule a call for Sparefoot "to help [the email recipient] get [their] Sparefoot listings up-and-running." Docs. No. 91-8; 91-9. Alves, Sr., had access to westmailselfstorage@gmail.com and checked the email daily. Doc. No. 91-2 at 24. He never responded to Sparefoot's email to inform Sparefoot that Alves, Jr., was not authorized to contract with Sparefoot or inquired what was meant by "Sparefoot listings." Id. "Where the principal permits the agent to do an act without objection, implied authority is proven." Selame Assocs., Inc. v. Holiday Inns, Inc., 451 F. Supp. 412, 420 (D. Mass. 1978). Here, Alves, Sr., was notified by email of son's engagement with Sparefoot and did not object, indicating Alves, Jr.'s, authority to contract with Sparefoot.

Finally, courts routinely enforce exclusive jurisdiction and venue provisions, which represent "the parties' agreement as to the most proper forum." Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas, 134 S. Ct. 568, 581 (2013); Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 18 (1st Cir. 2009). There is nothing unconscionable or unfair about the provision here. See Rivera, 575 F.3d at 18 ("Absent a finding of procedural or substantive unconscionability, courts have repeatedly enforced forum selection clauses[.]").

"A valid forum-selection clause should be given controlling weight in all but the most exceptional cases." Atl. Marine Const. Co., 134 S. Ct. at 581 (quoting Stewart Org., Inc. v. Ricoh

---

check by which Double Helix was paid. Doc. No. 91-7 at 2. Alves, Sr., never sought to cancel the check signed by his son. Doc. No. 91-2 at 31-32.

Corp., 487 U.S. 22, 33 (1988)). "[A]s the party defying the forum-selection clause . . . [the] plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed." Id. at 582. Ordinarily, a court deciding whether to transfer a case pursuant to 28 U.S.C. § 1404(a) considers both the private and public interest factors and considerations. Id. at 581. However, when the parties have contractually consented to a venue, "a district court may consider arguments about public-interest factors only." Id. at 582. These factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." Id. at 581 n.6. Here, the public interest factors are largely neutral. Sparefoot is a Texas corporation headquartered in Texas. Doc. No. 33 at 11. The parties agreed to a Texas choice-of-law and -venue provision. See Doc. No. 35, Ex. A. On the other hand, CR's single place of business is in Massachusetts, and CR has brought Massachusetts state law claims against Sparefoot. See Doc. No. 1. Given that the public factors in this case are largely neutral, this case is not among the "exceptional cases" where the forum selection clause does not control.

There is one more point that bears mention. CR alleges it became aware of certain conduct by Sparefoot in December 2016 and that the complaint encompasses conduct prior to the existence of the agreement between CR and Sparefoot, which was executed on February 2, 2017. See Doc. No. 47 at 7. While the Court accepts that characterization of the agreement for purposes of this motion only, it is of no assistance to CR. CR agreed that "[t]he federal and state courts of Travis County, Texas shall have exclusive jurisdiction and venue to adjudicate any dispute arising out of this Agreement." Doc. No. 35, Ex. A. Even if CR could somehow "split" its claim into two claims, one encompassing conduct pre-February 2, 2017, the other post- the

11

same date, under such circumstances, given the forum selection clause's applicability to the latter conduct, the public interest factors would warrant transfer in any event. Indeed so would 28 U.S.C. § 1404 in that scenario.

IV. <u>CONCLUSION</u>

For the forgoing reasons, CR's Motion to Amend (Doc. No. 70) is DENIED, Selfstorage's Motion to Dismiss is ALLOWED (Doc. No. 29), and Sparefoot's Motion to Transfer (Doc. No. 32) is ALLOWED. The clerk shall transfer this case to the United States District Court for the Western District of Texas, Austin Division.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge